**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD ALLEN COLLINS | : | |
| | : | |
| Appellant | : | No. 2043 EDA 2018 |

Appeal from the PCRA Order Entered June 22, 2018
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0004658-2015

BEFORE:   LAZARUS, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY NICHOLS, J.:                **FILED APRIL 22, 2019**

Appellant Richard Allen Collins appeals from the order denying his timely first petition under the Post Conviction Relief Act[1] (PCRA) without a hearing. Appellant argues that the trial court imposed an illegal sentence for his first-degree murder conviction and trial counsel was ineffective for making inappropriate remarks during closing arguments.  We affirm.

The PCRA court opinion set forth the relevant facts of this appeal as follows:

> Mariah Walton testified that she, Appellant and the murder victim, Artie Bradley, sold cocaine, crack cocaine and heroin from several locations in the Borough of Pottstown, Pennsylvania in 2014 and 2015.  Walton narrated to the jury while the prosecutors showed them a sequence of still photographs taken from a video recording . . . of a customer buying crack cocaine from Appellant, with the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

assistance of Walton and Bradley, inside an apartment at 826 East High Street in Pottstown.

Walton was Appellant's lover; and Appellant and Bradley were "like brothers." Bradley's relationship with the other two changed for the worse after Appellant and Walton returned from a trip in early February 2015, to find that "there was $10,000 worth of heroin money missing." Appellant confronted Bradley, whose excuses were unpersuasive. Appellant told Bradley he would have to pay the money back by way of future drug sales. Although Appellant tried to appear as if he "let it go" at that, he was still angry at Bradley because (as Walton explained on cross-examination) "[t]here's no way you're going to work off $10,000."

At approximately ten minutes before 10:00 p.m. on March 20, 2015, Sergeant Brian Rathgeb of the Pottstown Borough Police Department and a team of other police officers searched the area of the 400-500 blocks of Chestnut and Walnut Streets in Pottstown after being dispatched to investigate reports of gunshots. They found no victim of a gunshot wound or other evidence of shots being fired in that area. At approximately 11:30 p.m., Sergeant Rathgeb was dispatched to the nearby intersection of Beech and Washington Streets in Pottstown to investigate a call for an ambulance to treat an unresponsive person. That person—Bradley—was already dead when the ambulance team had arrived. Forensic pathologist Gregory McDonald, D.O., testified that he performed an autopsy of Bradley's remains and determined that Bradley had sustained seven gunshot wounds to the chest and abdomen, which caused fatal injuries to the lung and liver, which he agreed were "vital parts of the body." Mariah Walton testified,

> I was a knowing participant [in] the murder of Artie Bradley. I knew that [Appellant] had a gun, and I knew he went there to get in a confrontation, and I not only watched him kill Artie Bradley, I drove him away from the crime scene and covered up for him.

At the time Appellant and Walton decided to commit the murder, they had just learned that Bradley was at the home of a mutual friend, Troy Holmes, only a few blocks from the apartment Appellant and Walton rented at 423 East High Street in Pottstown. Appellant was expressing hostility toward Bradley, calling him derogatory names. Appellant put a gun in his jacket pocket and

- 2 -

told Walton he was leaving to confront Bradley and would telephone her when he was ready for her to pick him up in her car. Approximately two minutes after Appellant left, Walton drove her car to a vantage point on Washington Street where she could see when Appellant and Bradley would leave the home of their mutual friend, and telephoned Appellant to tell him she was waiting there. Walton saw Appellant and Bradley leave the home and cross the street together, then she saw Appellant shoot Bradley twice, saw Bradley fall, and saw Appellant shoot Bradley four more times as he lay on the ground. Walton put her car in gear, Appellant got in, and the two fled to Philadelphia.

PCRA Ct. Op., 8/23/18, at 1-4 (footnotes omitted).

Police arrested Appellant on March 24, 2015. On September 9, 2015, the Commonwealth charged Appellant with multiple offenses related to the homicide. The information also included drug offenses stemming from Appellant's and Ms. Walton's sale of crack cocaine to a confidential informant on January 28, 2015.

On January 6, 2016, Appellant and Ms. Walton filed a motion for a joint defense agreement, asserting that they wanted to prepare a joint defense strategy. The trial court granted the motion, and counsel and investigators for the co-defendants subsequently met and shared information about the case.

On February 26, 2016, Appellant filed a motion *in limine* to preclude testimony and a written statement from Ms. Walton. Appellant asserted that after the trial court granted the motion for joint defense agreement, Ms. Walton "provided a written statement incriminating [Appellant] and has agreed to testify against [Appellant] in exchange for a reduced sentence." Mot., 2/26/16, at ¶7. Appellant concluded that he would suffer extreme

prejudice if Ms. Walton testified against him, and he requested that the court bar Ms. Walton from testifying at trial. The court denied the motion *in limine* and Appellant proceeded to a jury trial.

Before trial commenced, Appellant's trial counsel requested permission to put certain information on the record about the defense strategy. The trial court granted this request and trial counsel conducted the following colloquy with Appellant:

> [Trial Counsel:] [Appellant], I asked the Judge to clear the courtroom, close the courtroom for a specific reason. I would like to put [information] on the record about our trial strategy, and the fact that you and I have spoken about this, okay?
>
> [Appellant:] Yes.
>
> [Trial Counsel:] But before I do, you understand that there may be some sort of a constitutional right, that you have the right to have all of this in front of witnesses and have an open courtroom. Are you okay with the fact that I asked the court to close this courtroom and exclude the public and the District Attorney's Office so that we get an opportunity to directly talk to the Judge without anybody else hearing what we're talking about?
>
> [Appellant:] Yes.
>
> [Trial Counsel:] Okay. That being said, is it true that you and I have had an opportunity to review all of the evidence in this case?
>
> [Appellant:] Yes.
>
> [Trial Counsel:] And the trial strategy that I have I want to talk about. We are going to proceed with a trial strategy that Mariah Walton was the shooter in this case?
>
> [Appellant:] Yes.

[Trial Counsel:] And as a result of proceeding under that strategy, we are going to have to essentially admit that you were present at the scene of the murder?

[Appellant:] Yes.

[Trial Counsel:] And that there really, if the jury does not buy the fact that Mariah Walton was the shooter in this case, that by virtue of the fact that we're putting you at the scene, we are essentially making it that much easier for the jury to potentially convict; do you understand that?

[Appellant:] Yes.

[Trial Counsel:] All right. But you and I have looked at all other possible defenses, such as self-defense, diminished capacity. We have talked about what that means. We have talked about the lack of . . . intent would reduce it from a first to a third-degree. We talked about alibi defenses, and just generally reasonable doubt. We talked about all other defenses; is that accurate?

[Appellant:] Yes.

[Trial Counsel:] And that you agree with me that this is the best trial strategy, based upon all of the—what I determine to be overwhelming evidence that puts you at the scene of the murder?

[Appellant:] Yes.

[Trial Counsel:] Okay. And have I forced, threatened or coerced you in any way to proceeding with this trial strategy?

[Appellant:] No.

[Trial Counsel:] And are you doing this of your own free will?

[Appellant:] Yes.

[Trial Counsel:] And do you believe, based upon all of the evidence that we have talked about and looked at, that that is the best possible trial strategy for this case?

[Appellant:] Yes.

[Trial Counsel:] Are you satisfied with my representation at this point?

[Appellant:] Yes.

[Trial Counsel:] And do you believe that by proceeding in this manner, it gives you the best possible defense that you might have?

[Appellant:] Yes.

[Trial Counsel:] I'm going to ask you one other question about yesterday's ruling. You understand that I filed a motion *in limine* to preclude [Ms. Walton], but the Judge has ruled against that; do you understand that?

[Appellant:] Yes.

[Trial Counsel:] I had thought about asking today, as a potential cautionary instruction or even a new motion, to have the Judge redact the portion of [Ms. Walton's] statement pertaining to the guns. You and I talked about that?

[Appellant:] Yes.

\* \* \*

[Trial Counsel:] And our goal is to say that the reason Mariah Walton knows about what gun it was is because she was the shooter?

[Appellant:] Right.

[Trial Counsel:] So by redacting that portion of the statement, it would actually hurt us at trial.

[Appellant:] Right.

[Trial Counsel:] And are you in agreement with that particular strategy as well?

[Appellant:] Yes.

[Trial Counsel:] And, again, has anybody forced, threatened or coerced you on that issue?

[Appellant:] No.

[Trial Counsel:] Are you satisfied with my decision to proceed with that strategy?

[Appellant:] Yes.

N.T. Trial, 3/1/16, at 3-8. The jury re-entered and trial began.

Thereafter, trial counsel extensively cross-examined Ms. Walton about her credibility and her cooperation with the authorities. Specifically, trial counsel asked Ms. Walton whether she was an honest person, and Ms. Walton responded that she was not. *See id.* at 142-43, 158. Trial counsel forced Ms. Walton to concede that she had lied to police three times before she provided her final account of what happened on the night of the murder. *See id.* at 148, 153-55. Trial counsel also questioned Ms. Walton about the deal she made with the Commonwealth in exchange for her cooperation against Appellant. Ms. Walton admitted that the Commonwealth dropped some charges against her and amended others, thereby eliminating the possibility that she would receive a sentence of life imprisonment.[2] *See id.* at 146-47, 156.

Trial counsel inquired about Ms. Walton's testimony that Appellant killed the victim over an unpaid drug debt. *See id.* at 160-62. Trial counsel forced Ms. Walton to acknowledge that Appellant would not be paid if he murdered

---

[2] Ms. Walton emphasized that the Commonwealth originally charged her with conspiracy to commit first-degree murder, but amended the charge to conspiracy to commit third-degree murder.

the victim, and Appellant had confronted other individuals about unpaid debts in the past without killing them. *Id.* Further, Ms. Walton testified that she sold drugs, possessed firearms, and had a reputation for violence at the time of the murder.[3] *See id.* at 149-51. Ms. Walton also confirmed that she was the only eyewitness to the murder. *See id.* at 147.

During his closing argument, trial counsel vigorously argued that the Commonwealth failed to prove that Appellant was the shooter:

> During my cross-examination, did I ever once suggest that my client, [Appellant], was not involved in a drug trade? Did I ever once suggest my client, as a result of that, didn't have access to guns?
>
> Now, again, not our burden to prove any evidence, but through my cross-examination questions, I thought it was pretty clear, [Appellant] is a drug dealer. [Appellant] had guns. [Appellant] is a bad guy. I don't like [Appellant]. But you know what? Because I don't like [Appellant], and because [Appellant] is a drug dealer, and [Appellant] had access to guns doesn't make him a murderer. It doesn't make the fact that he shot and killed Artie Bradley anymore of a fact.

N.T. Trial, 3/3/16, at 162.

Following trial, the jury convicted Appellant of two counts of criminal conspiracy and one count each of first-degree murder and possession of a controlled substance with intent to deliver (PWID).[4] On May 31, 2016, the trial court sentenced Appellant to life imprisonment for the first-degree murder

---

[3] Trial counsel did not attempt to cast doubt on Ms. Walton's comments about her drug dealing activities, and he did not attempt to distance Appellant from the drug dealing activities. *See* N.T. Trial, 3/1/16, at 149.

[4] 18 Pa.C.S. §§ 903, 2502(a), and 35 P.S. § 780-113(a)(30), respectively.

conviction, plus a consecutive term of one and one-half to five years' imprisonment for the PWID conviction. This Court affirmed the judgement of sentence on June 28, 2017, and Appellant did not seek further review with the Pennsylvania Supreme Court. *See Commonwealth v. Collins*, 3249 EDA 2016 (Pa. Super. filed June 28, 2017) (unpublished mem.).

On September 8, 2017, Appellant filed a *pro se* motion to vacate or correct an illegal sentence. The court treated Appellant's filing as a *pro se* PCRA petition and appointed PCRA counsel. PCRA counsel filed an amended PCRA petition on Appellant's behalf on February 9, 2018. In the amended petition, Appellant argued that the trial court imposed an illegal sentence for the first-degree murder conviction. Appellant claimed that his "life sentence is not a sentence imposed for a definite time and does not have a minimum and maximum release date. . . ." Am. PCRA Pet., 2/9/18, at 5. Appellant also asserted that trial counsel was ineffective for making derogatory comments about Appellant during his closing argument.

On May 23, 2018, the PCRA court issued a Pa.R.Crim.P. 907 notice of intent to dismiss the petition without a hearing.[5] The court determined that Appellant received a legal sentence for the first-degree murder conviction. The court also found that trial counsel's statements during closing argument constituted "sound trial strategy." Rule 907 Notice, 5/23/18, at 15. The

---

[5] The Court of Common Pleas incorrectly docketed the Rule 907 notice as "Order Denying Amended/Petition for [PCRA] Relief Without A Hearing." Docket Entry, 5/23/18.

- 9 -

parties did not respond to the Rule 907 notice, and the court denied Appellant's PCRA petition by order dated June 22, 2018.

Appellant timely filed a notice of appeal on July 17, 2018, and the PCRA court did not order him to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On August 23, 2018, the PCRA court filed a Pa.R.A.P. 1925(a) opinion, relying on the analysis set forth in the Rule 907 notice.

Appellant now raises two issues for our review:

> 1. Whether Appellant's sentence of life imprisonment without a minimum parole date is an illegal sentence under Pennsylvania law that must be vacated.

> 2. Whether Appellant's trial counsel was ineffective for making repeated derogatory, incriminating statements toward and about Appellant throughout his closing statement.

Appellant's Brief at 4 (full capitalization omitted).

In his first issue, Appellant acknowledges that a trial court can sentence a person convicted of first-degree murder to "a term of life imprisonment." *Id.* at 10 (quoting 18 Pa.C.S. § 1102(a)(1)). Appellant argues, however, that the relevant statutes do not state that "'a term of life imprisonment' is a term without a minimum sentence date, a mandatory minimum date, or that a convicted defendant is ineligible for parole at a minimum sentence date." *Id.* at 10-11. Appellant also cites the Sentencing Code for the proposition that a trial court "shall impose a minimum sentence of confinement which shall not exceed one-half of the maximum sentence imposed." *Id.* at 11 (quoting 42 Pa.C.S. § 9756(b)).

Based upon the foregoing, Appellant insists that the trial court needed "to impose a minimum sentence of confinement pursuant to [Section] 9756(b)," whereby Appellant would be eligible for parole. *Id.* at 12. "As there is no statutory authorization for Appellant to be sentenced without a minimum sentence, Appellant's sentence is illegal." *Id.* at 14. Appellant concludes that this Court must vacate the illegal sentence for his first-degree murder conviction. *Id.* at 16.

Our review of the denial of a PCRA petition is limited to the examination of "whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Miller*, 102 A.3d 988, 992 (Pa. Super. 2014) (quotation marks and citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Commonwealth v. Lawson*, 90 A.3d 1, 4 (Pa. Super. 2014) (citation omitted). We review the PCRA court's legal conclusions *de novo*. *See Miller*, 102 A.3d at 992.

"The PCRA provides the sole means for obtaining collateral review of a judgment of sentence. A court may entertain a challenge to the legality of the sentence so long as the court has jurisdiction to hear the claim." *Commonwealth v. Infante*, 63 A.3d 358, 365 (Pa. Super. 2013) (citations, quotation marks, and brackets omitted). "A claim that implicates the fundamental legal authority of the court to impose a particular sentence constitutes a challenge to the legality of the sentence. If no statutory

authorization exists for a particular sentence, that sentence is illegal and subject to correction." ***Id.*** at 363 (citations and quotation marks omitted).

The Crimes Code governs first-degree murder sentences as follows:

**§1102.  Sentence for murder, murder of unborn child and murder of law enforcement officer**

**(a) First degree.—**

> (1) Except as provided under section 1102.1 (relating to sentence of persons under the age of 18 for murder, murder of an unborn child and murder of a law enforcement officer), a person who has been convicted of a murder of the first degree or of murder of a law enforcement officer of the first degree shall be sentenced to death or to **a term of life imprisonment** in accordance with 42 Pa.C.S. § 9711 (relating to sentencing procedure for murder of the first degree).

18 Pa.C.S. § 1102(a)(1) (emphasis added).

When analyzing prior versions of the statutes governing sentences for first-degree murder, this Court has observed that

> the repealed 18 P.S. § 4701 and the current 18 Pa.C.S.A. § 1102[6] both mandate that a trial court not imposing the death penalty

---

[6] Section 4701 provided:

Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life at the discretion of the jury trying the case, which shall, in the manner hereinafter provided, fix the penalty[.]

18 P.S. § 4701 (repealed 1972).  The prior version of Section 1102 stated:

sentence a person convicted of first-degree murder to life imprisonment. Under the clear wording of the statute, the sentencing court may not sentence a first-degree murderer to a lesser term. Accordingly, we . . . conclude that the absence of the magic words "not less than" or "at least" does not render [a sentence of life imprisonment for first-degree murder] something other than a mandatory minimum.

*Commonwealth v. Yount*, 615 A.2d 1316, 1321 (Pa. Super. 1992); *accord Hudson v. Pa. Bd. of Prob. & Parole*, ___ A.3d ___, ___, 2019 WL 1339492, at *4-*5 (Pa. Mar. 26, 2019) (stating that Section 9756 was never intended specifically to create a personal right to be reviewed for parole, and the Board lacks the power to parole an inmate serving a mandatory life sentence for second-degree murder).

Instantly, the Crimes Code requires a term of life imprisonment for a person convicted of first-degree murder. *See* 18 Pa.C.S. § 1102(a)(1). We agree with this Court's interpretation of a substantially similar version of Section 1102 in *Yount*, which concluded that a term of life imprisonment without a minimum term is a legal sentence for individuals convicted of first-degree murder. *See Yount*, 615 A.2d at 1321; *accord Hudson*, 2019 WL 1339492, at *4-*5. Therefore, statutory authorization exists for Appellant's

_____

A person who has been convicted of a murder of the first degree shall be sentenced to death or to **a term of life imprisonment** in accordance with section 1311(d) [now 42 Pa.C.S.A. § 9711] of this title (relating to sentencing procedure for murder of the first degree).

18 Pa.C.S. § 1102 (amended 2012) (emphasis added).

- 13 -

sentence, and the PCRA court's determination is free of legal error. *See Miller*, 102 A.3d at 992; *Infante*, 63 A.3d at 363.

In his second issue, Appellant cites the previously quoted portion of trial counsel's closing argument, contending that trial counsel made "repeated, derogatory, incriminating statements" about Appellant and Appellant's involvement in the drug trade. Appellant's Brief at 17. Appellant asserts that trial counsel did not inform Appellant "about his intention to make such statements that would concede his guilt on certain charges and demean his character." *Id.* Appellant claims that trial counsel did not have a reasonable strategic basis to make the comments at issue. *Id.* Moreover, the comments resulted in prejudice to Appellant, because trial counsel's characterization of Appellant "signaled to the jury that Appellant was capable and willing to commit murder." *Id.*

Appellant also relies on *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), for the proposition that "a defendant has the right under the Sixth Amendment of the United States Constitution to insist that his counsel refrain from admitting his guilt, even if his counsel had a reasonable strategy for doing so." *Id.* at 19. Pursuant to *McCoy*, Appellant alleges that trial counsel's comments need not be reviewed under the traditional three-prong test for ineffectiveness. *Id.* "Rather, a violation of a defendant's autonomous rights occurs under the Sixth Amendment and is therefore a 'structural error' not subject to harmless error review." *Id.* at 19-20. Appellant concludes that "not only was [trial] counsel ineffective in making the statements to the jury,

[trial] counsel also violated Appellant's Sixth Amendment rights by making such statements, perpetuating his ineffectiveness." *Id.* at 21.

We presume that the petitioner's counsel was effective. *Commonwealth v. Williams*, 732 A.2d 1167, 1177 (Pa. 1999). To establish a claim of ineffectiveness, a petitioner "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Turetsky*, 925 A.2d 876, 880 (Pa. Super. 2007) (citation omitted). A petitioner must establish (1) that the underlying claim has arguable merit; (2) that counsel lacked a reasonable basis for his action or inaction; and (3) but for the act or omission in question, the outcome of the proceedings would have been different. *Commonwealth v. Washington*, 927 A.2d 586, 594 (Pa. 2007). "A claim of ineffectiveness may be denied by a showing that the petitioner's evidence fails to meet any of these prongs." *Id.* (citation omitted).

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit[.] Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." *Commonwealth v. Smith*, 167 A.3d 782, 788 (Pa. Super. 2017) (citations and quotation marks omitted).

"With regard to the second, reasonable basis prong, we do not question whether there were other more logical courses of action which counsel could

have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." **Commonwealth v. Chmiel**, 30 A.3d 1111, 1127 (Pa. 2011) (citation and quotation marks omitted). "We will conclude that counsel's chosen strategy lacked a reasonable basis only if [the petitioner] proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." **Id.** (citation and quotation marks omitted); **see also Commonwealth v. Rega**, 933 A.2d 997, 1018-19 (Pa. 2007) (stating a petitioner "must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of conduct" (citation omitted)).

In **McCoy**, the attorney conceded that his client committed three murders during the guilt phase of a capital trial. The attorney's concession came despite the defendant "vociferously insist[ing] that he did not engage in the charged acts and adamantly object[ing] to any admission of guilt." **McCoy**, 138 S. Ct. at 1505. Consequently, the United States Supreme Court held "that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." **Id.**

Instantly, the PCRA court provided context for trial counsel's closing argument:

> [Appellant] was accused of conspiring with [Walton] to murder his former partner in drug dealing, Artie Bradley, because he thought Bradley had cheated him of proceeds from their drug sales. The

evidence against [Appellant] included a similar act in which he and Walton had worked together to assault another man, Herbierto Delmorel, who had stolen drugs belonging to the [Appellant and] Bradley['s] partnership. The evidence also included testimony that [Appellant] and Walton had purchased a firearm in preparation for their plan to kill Bradley, and evidence that [Appellant] possessed other firearms was relevant and admissible to [a] charge of unlawful possession of a firearm.

Rule 907 Notice at 13 (record citations omitted).

In light of this record, the PCRA court concluded that trial counsel had a reasonable basis for commenting on Appellant's character during his closing argument:

[Trial counsel's] closing remarks were sound trial strategy. He anticipated the risk that the jurors would be inclined to conclude [Appellant] murdered Bradley because of his character, as indicated by his prior assaults and possession of guns. Because the evidence left him unable to portray [Appellant] as a virtuous man, [trial counsel] took the approach of reminding the jurors that they were not to consider character when deliberating. Because of the direct and indisputable evidence that [Appellant] was guilty of the drug and firearms charges, [trial counsel] conceded guilt as to those; but not the murder, which was proven by circumstantial evidence and the testimony of Walton, who pled guilty and knew her testimony would be considered when she was sentenced. [Trial counsel's] decision to do so was tactically sound because it maximized the credibility he and his client could preserve with the jurors and prompted them to contrast the strength of the Commonwealth's evidence of the lesser charges with the strength of the evidence of the murder charge.

*Id.* at 15-16. Following our review of the record and Appellant's arguments, we discern no basis to disturb the PCRA court's determination.

To the extent Appellant relies on *McCoy*, that case is distinguishable. Whereas the defendant in *McCoy* "adamantly objected" to his attorney's actions, Appellant consulted with trial counsel and agreed upon the best

- 17 -

strategy for his case. Appellant's on-the-record colloquy demonstrated that he was aware of other possible defenses, but he opted to have trial counsel do everything possible to convince the jury that Ms. Walton actually shot the victim. **See** N.T. Trial, 3/1/16, at 3-8. The contested remarks in trial counsel's closing argument amounted to a final effort to help advance the chosen defense strategy.

In light of the relevant case law and applicable standard of review, we conclude that the PCRA court properly determined that trial counsel had a reasonable basis for his actions. **See Chmiel**, 30 A.3d at 1127; **Miller**, 102 A.3d at 992. Therefore, we conclude that the PCRA court did not err in denying Appellant's petition.[7]

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/22/19

_____

[7] On March 1, 2019, Appellant filed a *pro se* motion to strike the Commonwealth's brief. Because Appellant has counsel of record, we direct this Court's Prothonotary to forward the *pro se* motion to counsel. **See Commonwealth v. Jette**, 23 A.3d 1032, 1044 (Pa. 2011) (reiterating "that the proper response to any *pro se* pleading is to refer the pleading to counsel, and to take no further action on the *pro se* pleading unless counsel forwards a motion").